UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SANDRA SMITH FRISBIE,

                                    Plaintiff,

          v.                                       3:04-CV-435
                                                    (J. Kahn)

COMMISSIONER OF SOCIAL
SECURITY,

                                  Defendant.
_____

APPEARANCES:                            OF COUNSEL:

HINMAN, HOWARD & KATTELL, LLP    EUGENE D. FAUGHNAN, ESQ.
Attorneys for Plaintiff

GLENN T. SUDDABY                  WILLIAM H. PEASE
United States Attorney for the           Assistant U.S. Attorney
 Northern District of New York
Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## PROCEDURAL HISTORY

Plaintiff previously filed an initial application for disability insurance benefits on February 27, 1998. (Administrative Transcript ("T") at 77-79). The application was denied initially and upon reconsideration. (T. 67-70, 72-75). During November

of 1998, plaintiff requested a hearing but withdrew that request and on August 17th, a Notice of Dismissal was issued, based on plaintiff's request to withdraw the claim. (T. 76, 26-29). The present application for disability insurance benefits was filed on February 16, 2001. (T. 242-244). The application was denied initially on April 23, 2001.[1] (T. 227-230).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on April 18, 2002 . (T. 47-63). The ALJ found that plaintiff was not disabled on July 22, 2002. (T. 16-24). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review on March 25, 2003. (T. 9-10).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The Commissioner failed to sustain her burden of proof. (Brief, p. 5[2]).

(2) The ALJ erred by failing to follow the Treating Physician Rule. (Brief, p. 8).

(3) The ALJ erred by improperly discounting plaintiff's allegations of disabling pain. (Brief, p. 9).

(4) The ALJ failed to use a Vocational Expert (VE). (Brief, p. 11).

(5) This case should be remanded for calculation of benefits. (Brief, p. 13).

---

[1] A request for reconsideration was not required in this application, and plaintiff was informed in the notice of denial that she could immediately request an ALJ hearing. (T. 228).

[2] Plaintiff's Brief does not comply with General Order 18 since it does *not* contain many critical page references to the record and cites many cases from circuits other than the Second Circuit. *See* Brief at 9-13.

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record and must be affirmed.

## FACTS

This court adopts the facts contained in the Commissioner's brief under the heading "The Administrative Record, Plaintiff's Testimony" on page 3, to the extent that those facts are consistent with this Report-Recommendation.

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe

impairment" which significantly limits [her] physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

1. **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether

substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 2.  Medical Evidence

Although plantiff's filing date for the present application was February 16, 2001, (T. 242-44, 408-410), plaintiff is claiming disability as of July 2, 1996, and the Administrative Record contains extensive medical records relevant to the claims in this case.  Plaintiff claims disability due in part to injuries from a motor vehicle

accident in July of 1991 when she had a fracture of her left hand and a "crushed foot" injury. (T. 128-44, 159). Plaintiff had reconstructive surgery on her right foot during October of 1992, (T. 131-33). Surgery was performed on her left hand during 1991. (T. 129-134). The doctor who performed surgery on plaintiff's hand during late 1991 reported on December 10, 1991, that plaintiff's hand was doing "incredibly better with good function". (T. 134). That same surgeon reported that plaintiff's foot injury was more complicated. (T. 134).

After plaintiff's foot surgery in October of 1992, her surgeon, Dr. Dewey, reported that plaintiff was unable to ambulate for more than short periods of time (T. 135) and was unable to work except for a "brief minimum of sedentary work." (T. 135). Dr. Dewey did, however, recommend that plaintiff have vocational rehabilitation to return her to the work force as soon as possible. (T. 135). Although Dr. Dewey reported in March of 1992 that plaintiff's foot had not improved, he could not find any nerve injury that would account for plaintiff's pain. (T. 136). Dr. Dewey followed plaintiff during 1992 (T. 138-139), and during 1993, Dr. Dewey wrote that plaintiff was still complaining about pain. Dr. Dewey stated that plaintiff should proceed to obtain her General Equivalency Diploma and proceed with a "primarily sedentary type position". (T. 140). His recommendation for plaintiff was that she have a strictly sedentary job. (T. 141). Dr. Dewey did state that plaintiff should not be engaged in stooping, kneeling, crawling, or walking on uneven ground, and that she should not lift greater than 5 pounds with her left arm. (T. 141).

In August of 1996, Dr. Dewey reported that plaintiff continued to complain about chronic right foot pain and continues to complain of weak function in her left hand. (T. 143). Dr. Dewey believed that plaintiff would need some type of corrective surgical procedure to realign the fingers in plaintiff's left hand. (T. 143).

In early 1998, plaintiff moved from Florida to New York State and visited an emergency room on February 23, 1998. (T. 158). The medical notes from that visit state that plaintiff had not experienced much discomfort in her foot over the years but recently noted swelling and discoloration. (T. 158). Several months later in May of 1998, plaintiff had x-rays of her left hand, right foot and lumbar spine. The right foot x-rays showed the surgical changes to her foot but the x-rays for plaintiff's left hand and lumbar spine were normal and unremarkable. (T. 173). In 1998, plaintiff received care from various parts of the Guthrie Clinic in Sayre, Pennsylvania. Plaintiff had examinations by Dr. Harper, Dr. Suarez, Dr. Flood, and Dr. Siegel. (T. 181, 183-187, 189).

In June of 1998, a very comprehensive Functional Capacity Evaluation was performed on plaintiff, testing many specific areas of muscle and body function. (T. 303-308). The examiner concluded that plaintiff had some inconsistent test results which were "not associated with physical problems". (T. 303). The examiner also believed that plaintiff had "inappropriate pain behavior", (T. 304), and inconsistent pain in her right foot. (T. 305). The examiner concluded that plaintiff could perform light work and lift 10 pounds frequently. (T. 306-308). The evaluation also recommended that plaintiff perform general conditioning, aerobic-type exercises, and strengthening and stretching exercises. (T. 307).

In July of 1998, plaintiff was examined at the Guthrie Clinic.[3] (T. 180). Plaintiff told the doctor that she was very upset with the Functional Capacity

---

[3] The court notes that the Guthrie Clinic reports often have two different doctors' names at the bottom of the report. The report at page 180 of the Administrative Record has the names Dr. Christopher Flood, M.D. and Dr. Thomas F. Gole, D.O. at the bottom, however, only Dr. Gole's name is at the top of the report, so it is unclear who actually examined plaintiff. But it appears that the examination would have been conducted by the doctor whose name appears at the top of the page. In any event, it is clear that both doctors agree with the report.

Evaluation which found her capable of light work activity. (T. 180). In September of 1998, plaintiff was again examined at the Guthrie Clinic. (T. 181). The report states that plaintiff complained of back and neck pain as well as decreased strength on her left side and tingling and numbness radiating down her left arm. (T. 181). Plaintiff stated that she had been experiencing these symptoms for *several months*. *Id.* Plaintiff told the doctor that she had been attempting to work. In the report, signed by Dr. Flood and Barry Harper, M.D., the doctors noted that plaintiff was able to move her neck fully and flex and extend the neck, and although the motion caused pain, there was no tingling or numbness noted. (T. 181). Plaintiff had pain on palpitation of the lower back. She was able to flex 40 degrees and extend without difficulty. Lateral rotation caused pain. Neurologically, plaintiff had decreased pinprick on the C5 distribution on the right side, while normal sensation on the left. The doctors found decreased strength on the right and ordered an Magnetic Resonance Imaging (MRI) test.

On October 1, 1988, Dr. Flood reported that plaintiff's back pain was 25% improved according to the plaintiff.[4] (T. 185). That same month, when plaintiff was examined by Dr. Bonita Siegel at the neurology section of the Guthrie Clinic, Dr. Siegel reported that plaintiff stated her back had been hurting for *seven years* and that it was always painful at night. (T. 189). Dr. Siegel concluded that plaintiff's details about her history seemed slightly inconsistent. (T. 191). Dr. Siegel also concluded that plaintiff might have a peripheral nervous system problem or some type of chronic pain syndrome. Dr. Siegel recommended that plaintiff be placed on Zoloft and have a nerve conduction study performed. (T. 192).

---

[4] However, on October 14, 1998, plaintiff told Dr. Gole that her back pain had *not improved*. (T. 194).

A nerve conduction study was performed during December of 1998. At the time of the nerve conduction study, plaintiff reported problems in her back and neck, and headaches. (T. 193). The examination found some weakness in certain muscle groups and a slightly decreased knee jerk in plaintiff's left leg. The impression of the physician was that the nerve conduction study was "an abnormal study" (T. 193), and the electrophysiologic evidence indicated a left C8 radiculopathy. (T. 193).

Another nerve conduction study was performed a little more than two years later on January 9, 2001 by neurologist, Iman Youssef. (T. 358, 360).[5] This nerve conduction study was reported as normal. (T. 360). The report results stated "this is a normal electrophysiological test with no evidence of a neuropathy, myopathy, or carpal tunnel syndrome. The report stated that "[h]owever, a normal test cannot exclude the diagnosis of cervical radiculopathy." (T. 360). A repeat MRI of the cervical spine was recommended. (T. 360).

During late 1999, plaintiff began treatment at the Guthrie Clinic Pain Management Clinic and Dr. Lockard. (T. 319-24). Plaintiff received injections known as epidural steroid injections directly into her cervical spine to give pain relief. (T. 320). Dr. Lockard found tenderness in plaintiff's cervical spine and paracervical muscles with reduced strength in plaintiff's left arm. (T. 319). An MRI of plaintiff's cervical spine during October of 2000 was compared with an MRI done two years earlier during October of 1998. Both MRIs showed a small disc bulge at Level C6 and C7 which had not become any worse, and the rest of plaintiff's cervical spine was "unremarkable" with plaintiff's disc spaces and vertebral bodies well maintained and

---

[5] There is no page 359 of the Administrative Record, however, it appears that the pages were misnumbered, and that there is actually no missing page.

normal. The examiner concluded that plaintiff had a mild disc bulge at Level C6 and C7 which was unchanged from 1998. (T. 336).

X-rays of plaintiff's lumbar spine were also performed during 1999 and were essentially negative. (T. 338, 343). Dr. Suarez of the Guthrie Clinic recommended that plaintiff receive physical therapy which she did during December of 2000. The physical therapist reported that plaintiff was working at a business known as James Diner, and that plaintiff was on her feet all day long. (T. 347). The physical therapist also stated that plaintiff's prolonged walking and prolonged standing were aggravating factors for her foot pain. (T. 347). The physical therapist's notes indicated that plaintiff was not doing certain recommended exercises even though they alleviated foot pain. (T. 347-48).

During March of 2001, plaintiff was examined by consultative physician, Dr. Anthony Canino, who examined her for orthopedic purposes and for general medicine purposes. (T. 361-365, 366-369). Dr. Canino found normal flexion in plaintiff's cervical spine, some limited flexion in plaintiff's lower spine, a normal range of motion in plaintiff's upper extremities, and a full range of motion in plaintiff's lower extremities. (T. 365). Dr. Canino found mild limitations in fine movements of plaintiff's upper extremities, mild limitations in household chores and activities, and mild to moderate limitations of walking, stair climbing, sitting, and standing. (T. 364). In his general examination, Dr. Canino found full range of motion in plaintiff's shoulders, forearms and wrists, and full range of motion in plaintiff's hips, knees, and ankles. (T. 368). There was some limited flexion in plaintiff's lumbar spine but the examination showed no spasm or point tenderness. (T. 368).

In August of 2001, a Residual Functional Capacity (RFC) Assessment form was sent to a physical therapist by the plaintiff's attorney. Physical Therapist Todd

Mansfield found that plaintiff could sit for only 60 minutes total in a work day or stand for 60 minutes total in a work day, with 20 minutes of uninterrupted sitting and 10 minutes of uninterrupted standing. (T. 385). Despite these findings, it appears that the same physical therapist stated that plaintiff "demonstrated the ability to perform sedentary work". (T. 389). This RFC assessment by the physical therapist was sent to Dr. Burdett Porter of the Pain Management Clinic section of the Guthrie Clinic, and Dr. Porter checked a box stating that he agreed with the functional limitations stated by the physical therapist. (T. 391). Dr. Porter's response to the question was simply "yes", and no other details were given by Dr. Porter. (T. 392).

Dr. Lockard of the Anesthesiology section of the Guthrie Clinic continued to treat plaintiff during 2002, and opined that plaintiff had right arm pain which was consistent with a complex Regional Pain Syndrome Type 1. (T. 393). Dr. Lockard surgically installed a Percutaneous Spinal Cord Stimulator in plaintiff's cervical spine. (T. 393). Plaintiff reported that this stimulator "worked very well" and reduced her right arm pain 50%. (T. 393). Plaintiff was pleased with the results and wanted a permanent stimulator installed. (T. 393). A permanent Spinal Cord Stimulator was surgically installed during February of 2002. (T. 402).

**3.    Treating Physician**

The medical conclusions of a treating physician are controlling if well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). *See also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999). An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d at 79 (citations omitted). If the treating physician's opinion is not

given "controlling weight," the ALJ must assess the following factors to determine how much weight to afford the opinion: the length of the treatment relationship, the frequency of examination by the treating physician for the condition(s) in question, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the qualifications of the treating physician, and other factors tending to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2-6); 416.927(d)(2-6).  Failure to follow this standard is a failure to apply the proper legal standard and is grounds for reversal. *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998) (citing *Johnson v. Bowen*, 817 F.2d at 985).

Although plaintiff argues on page 9 of the brief that the ALJ "improperly considered the opinion of the claimant's treating physicians", it is unclear precisely to which opinions the plaintiff is referring.  There are no transcript references for citations to treating physicians' opinions.  As is obvious from this record, the record contains *many* examinations and reports by *many* treating physicians focusing on different problems of the plaintiff, including her foot surgery, hand surgery, neck and back pain.  The record also contains a neurology examination and a psychiatric examination. (T. 203-204).  Plaintiff's argument is, therefore, not supported by any specific references to the record.

Plaintiff argues that the ALJ accepted the opinion of a non-treating, non-examining physician and utilized the consulting physician's opinion for support.  Plaintiff then states that the "treating physician" opined that plaintiff was unable to perform the full range of sedentary work. (Brief p.9).  In 1993, three years *prior* to plaintiff's alleged onset date, Dr. Dewey, plaintiff's treating physician at that time, stated that plaintiff was limited to "sedentary work" and that she could not stand or walk for more than one hour in an eight hour day.  (T. 140-41).  Dr. Dewey's report

also stated that plaintiff could not stoop, kneel, crawl, or walk on uneven ground and could not lift more than five pounds with *her left hand*. (T. 141). The court would point out that after that assessment, plaintiff worked at various jobs. (T. 102, 285).

In 1998, Physical Therapist Jim Copeland opined that plaintiff could perform light work. (T. 303-308). Although the physical therapist is not a "treating physician", it is clear that the doctors at the Guthrie Clinic were aware of this assessment because one of them mentioned in a report that plaintiff was unhappy with the finding that she could perform light work. (T. 180). In the report, the doctor merely stated that he had spoken to plaintiff's case worker, and that the case worker would discuss this finding with plaintiff, and that plaintiff could pursue this through her "vocational training." (T. 180). The doctor did not state that he agreed or disagreed with the assessment.

In August of 2001, Physical Therapist Todd Mansfield also assessed plaintiff's ability to perform work, and although he placed severe restrictions on her ability to sit and walk, he stated in the narrative section of his report that plaintiff would be able to perform sedentary work within the meaning of the Dictionary of Occupational Titles. *Compare* T. 385-88 *with* T. 389-90. This assessment was also sent to Burdett Porter, M.D., who simply signed a form stating that he agreed with PT Todd Mansfield's assessment. (T. 391-92). Thus, it does not appear that any treating physician opined specifically that plaintiff could not perform any substantial gainful activity.

The record does contain conflicting evidence from consulting examiners, namely, the consulting examinations by Dr. Anthony Canino, who generally found that plaintiff had only mild to moderate limitations in physical activities such as walking, stair climbing, sitting and standing. (T. 361-369). These results appear to be slightly inconsistent, however, Dr. Burdett Porter's agreement with the functional

13

limitations by a one-time examining physical therapist does not provide substantial evidence of disability.

Genuine conflicts in the record are for the ALJ to resolve, and the ALJ is entitled to rely on a consultative report that is consistent with the medical evidence. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In fact, the ALJ does not reject any treating physician's opinion, rather, the ALJ states that none of the physicians who examined plaintiff "in ***either a treating or consultative capacity***" had noted restrictions that would preclude sedentary work. (T. 23)(emphasis added). The ALJ did reject the opinion of physical therapist T. Mansfield and signed by Dr. Porter, but specifically the ALJ stated that this evaluation stood "alone" and was inconsistent with the other medical evidence. This court does not find that the ALJ violated the Treating Physician Rule.

### 4. **Pain and Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce

the pain or other symptoms alleged...." 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

Plaintiff argues that the ALJ did not properly analyze plaintiff's complaints of pain. The record shows that plaintiff has had many ***inconsistent complaints of pain and inconsistent test results clearly noted by the examiners***. For example, her Functional Capacity Evaluation (T. 303-308), the examination by Dr. Siegel (T. 169-192), and plaintiff's statements to a physical therapist during December of ***2000*** that she was working all day long at a diner and was on her feet all day long walking, are inconsistent with a claim of inability to work during the year 2000.

The physical therapy evaluation conducted in 1998 stated that plaintiff's "pain behavior" seemed to be "somewhat exaggerated" based on the results of the tests. (T. 307). Plaintiff did state to Dr. Lockard that the Percutaneous Spinal Cord Stimulator

15

worked very well and reduced her arm pain 50%. Her testimony does not appear to reflect any reduction in pain since plaintiff states that since 1996 her problems are worse. (T. 52, 53-56, 58-59). In her testimony, plaintiff claimed that the fingers in her left hand were giving her problems, yet the medical record does not show any treatment for that complaint, and plaintiff worked in a restaurant during that time. The record supports the ALJ's finding that plaintiff's complaints are not fully credible.

The court also notes that there is a document in the record, indicating that plaintiff contacted the agency on July 28, 1998 asking whether she should "quit her job" because she was afraid that because she was working she would not get disability. (T. 119). This statement is inconsistent with plaintiff's claims that she became disabled in 1996 and that she was in disabling pain, and supports the ALJ's finding that plaintiff's allegations of her limitations were "not totally credible." (T. 24).

## 5. **Residual Functional Capacity**

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See also Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *LaPorta v. Bowen*, 737 F. Supp. at 183. Furthermore, an ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

The court would first point out that plaintiff's first argument alleges that the Commissioner did not prove that plaintiff was capable of performing substantial gainful activity. (Brief, p. 5). The ALJ specifically found that plaintiff could return to her former employment as a secretary. (T. 24). As stated above, the determination that an individual has the RFC to return to her former work is a determination at Step 4 of the Step 5 analysis. Step 5 was never reached in this case. As stated above, it is the ***plaintiff's burden*** at the first four steps of the disability analysis to show that she cannot return to her prior occupation.

In determining that plaintiff could perform sedentary work, the ALJ utilized the treating physicians' statements that plaintiff could perform "sedentary work" together with the consultative physician's statement that plaintiff would only have mild to moderate limitations on many of the basic work functions, and the RFC evaluation completed by a disability examiner that is consistent with the stated medical restrictions.

### 6. <u>Vocational Expert</u>

Plaintiff argues that the ALJ should have used a vocational expert (VE) because she suffers from the non-exertional impairment of pain, and that the ALJ "improperly used the Grids" in making his determination of disability. The court would first point out that, as stated above, the ALJ found that plaintiff could return to her prior work, a finding at Step 4 of the 5-step analysis. The burden was still on plaintiff, and the ALJ did not use the Medical Vocational Guidelines (the Grids) to make his decision. Thus, plaintiff's argument is misplaced.

While it is true that the ALJ must always consider a plaintiff's pain or non-exertional impairments,[6] the ALJ in this case properly found that plaintiff's complaints of pain were not credible and did not prevent her from performing her previous sedentary work. It is only at step *five* that the ALJ must determine whether a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations. If so, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986). However, even at step five, the fact that plaintiff has non-exertional impairments would ***not automatically foreclose*** the use of the Grids without a finding that those non-exertional impairments "significantly limited" plaintiff's ability to perform an exertional range of work. *Bapp v. Bowen*, 802 F.2d at 605-606.

If the plaintiff's range of work is significantly limited by her non-exertional impairments, then the ALJ must present the testimony of a vocational expert or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform. *Id.* A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v.*

---

[6] The court would point out that pain itself is not necessarily a "non-exertional" impairment. The Second Circuit has cited the Social Security regulations in defining "exertional" limitations as limitations and restrictions imposed by impairments and related symptoms such as pain that affect only the ability to meet the strength demands of jobs such as sitting, standing, walking, lifting, carrying, pushing and pulling. *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004)(citing 20 C.F.R. § 416.969a(b)). *See also id.* § 404.1569a(b). Non-exertional limitations are those limitations and restrictions imposed by impairments and related symptoms such as pain that affect only the ability to meet the demands of jobs ***other than strength demands.*** *Id.* (citing 20 C.F.R. § 404.969a(c)). *See also* 20 C.F.R. § 404.1569a(c). The regulations refer to pain as a symptom that can lead to exertional or non-exertional limitations.

*Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).  This entire analysis assumes that plaintiff has sustained her burden of showing that he cannot perform his previous work.  Plaintiff in this case has ***not done so.***

The court does note that in 2002, plaintiff had a spinal cord stimulator implanted to assist in relieving her pain. (T. 404-407).  Shortly after the surgery, plaintiff had complained of pain in her right buttock from the device. (T. 407).  The pain resulted after riding "for a long time in her truck." (T. 407).  However, at the hearing, during the discussion of the stimulator, plaintiff never stated that she was still having pain as a result of the implant. (T. 55-57).  Thus, this court finds that the ALJ did not err in failing to use a VE in plaintiff's case.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED,** that the decision of the Commissioner be **AFFIRMED** and the Complaint (Dkt. No. 1) be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 6, 2006

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge